# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| BONNIE R. EDWARDS, | ┊ | |
| Plaintiff, | ┊ | CIVIL ACTION NO. |
| | ┊ | 3:17-CV-298 (JCH) |
| v. | ┊ | |
| | ┊ | |
| NANCY E. BERRYHILL, ACTING | ┊ | |
| COMMISSIONER OF SOCIAL | ┊ | |
| SECURITY, U.S.A., | ┊ | JANUARY 31, 2018 |
| Defendant. | ┊ | |

## RULING RE: CROSS MOTIONS TO REVERSE AND AFFIRM DECISION OF THE COMMISSIONER (DOC. NOS. 20 & 21)

## I.      INTRODUCTION

Plaintiff Bonnie Rae Edwards ("Edwards") brings this action under title 42, section 405(g) of the United States Code, appealing from the final determination of the Commissioner of Social Security ("the Commissioner"), who denied her application for Title II disability insurance benefits in whole and her application for Title XVI supplemental security income in part, based on a finding that Edwards became disabled on November 1, 2012.  Motion to Reverse the Decision of the Commissioner ("Pl.'s Mot.") (Doc. No. 20).  The Commissioner cross-moves for an order affirming that Decision.  Defendant's Motion for Judgment on the Pleadings ("Def.'s Mot.") (Doc. No. 21).

For the reasons set forth below, the Motion to Reverse the Decision of the Commissioner (Doc. No. 20) is granted, and the Motion for Judgment on the Pleadings (Doc. No. 21) is denied.  The ALJ's October 2016 Decision is vacated with respect to the period before November 1, 2012, and the case is remanded to the ALJ for proceedings consistent with this Ruling.

## II. RELEVANT FACTS

The court assumes the parties' familiarity with the evidence of Record, and it will therefore only briefly describe the facts relevant to this opinion.

Bonnie Rae Edwards was born in April 1958.  See, e.g., Certified Transcript of Record ("R.") (Doc. No. 16) at 2190.  During her childhood, many of her family members, including her stepfather and her grandmother, were alcoholics.  See id. at 1251, 1264.  At age eight, friends of her older brother sexually abused her.  See id. at 1251.  She has been married twice (and divorced twice) and was physically abused by both her ex-husbands, as well as other men with whom she has been in relationships.  See id. at 1251–52, 2255–56.  These experiences led to the development of post-traumatic stress disorder ("PTSD").  See, e.g., id. at 484.  Edwards had four children, one of whom was murdered in June 2012.  See id. at 2648–49.

Edwards has a long history of substance abuse, including addictions to alcohol, heroin, and cocaine, as well as the abuse of prescription opiates and crack cocaine.  See, e.g., id. at 2206.  Although she has had periods of sobriety, she also had frequent relapses through approximately 2009.  See id.  For at least some of the time in which she was actively abusing substances, Edwards was homeless, staying variously with family, in shelters, or on the street.  Id. at 1250.

From the last nineties through 2002, Edwards was employed in various administrative roles at Yale University.  See id. at 2244.  In 2002, Edwards was terminated as a result of excessive absences stemming from her drug use.  Id.  Although she has briefly obtained work since then, she has not been able to hold a position long enough to constitute "substantial work" since her employment with Yale.  See id. at 2203.

Her medical history indicates that she has been diagnosed with depression, bipolar disorder, PTSD, anxiety disorder, borderline personality disorder, heroin dependence, and cocaine dependence. See, e.g., id. at 436, 450, 1264. She has also been diagnosed with asthma; carpal tunnel syndrome; degenerative disc disease; sciatica; gastrointestinal reflux disease; varicose veins; hepatitis A, B, and C; and genital herpes. See, e.g., id. at 1264–66, 1691, 1841, 2206–10 (summarizing medical history).

## III.    PROCEDURAL HISTORY

To say that this case has a lengthy procedural history would be an understatement. In total, the case has been before two different ALJs, who have held a total of six hearings and issued four decisions, and has reached the District of Connecticut on two occasions prior to this case. The following is a summary of the relevant procedural history.

Edwards filed a Title II application for a period of disability and disability insurance benefits on April 17, 2006. See R. at 224–28. She also filed a Title XVI application for supplemental security income on April 17, 2006. See id. at 229–33. Both applications alleged that her disability onset date was January 1, 2003. The Social Security Administration denied her claims initially on August 3, 2006, and upon reconsideration denied them again on January 12, 2007. See id. at 139–41, 148–50. Edwards then requested a hearing, which took place before Administrative Law Judge ("ALJ") Ronald Thomas on December 17, 2007. Id. at 1315–45. Following that hearing, ALJ Thomas issued a partially favorable Decision on January 25, 2008, finding Edwards disabled as of July 1, 2007, but not before that date. Id. at 113–32. ALJ Thomas found that Edwards was unable to work between January 1, 2003, and July 1, 2007, but that

3

she was not eligible for disability benefits during this period because "she failed to follow treatment prescribed by a treating source that can be expected to restore her ability to work." Id. at 129.

The Social Security Appeals Commission vacated and remanded ALJ Thomas's January 2008 Decision on January 15, 2009. Id. at 133–38. The Appeals Commission observed that ALJ Thomas had reached conflicting conclusions in his Decision, namely that Edwards would have been able to work prior to July 1, 2007, had she not been abusing substances, while at the same time concluding that Edwards became eligible for benefits on July 1, 2007, because of her sobriety. Id. at 137. The Appeals Commission noted, too, that "[i]rrespective of this apparent contradiction, the Appeals Council is of the opinion that the real issue in this case is whether or not drug addiction is a contributing factor material to the issue of disability, and not whether the claimant failed to follow prescribed treatment." Id. The Appeals Council ordered, among other things, that ALJ Thomas obtain testimony from a medical expert. Id.

On June 24, 2009, ALJ Thomas held another hearing. Id. at 60–107. During this hearing, medical expert Dr. Billings Fuess, PhD,[1] testified by phone, over the objection of counsel for Edwards, Attorney Ivan Katz. See id. at 63–64. Following this hearing, ALJ Thomas issued a Decision on November 23, 2009. Id. at 7–37. In his 2009 Decision, ALJ Thomas concluded that Edwards met the listing 12.09, finding that she had behavioral changes associated with the regular use of substances, marked limitations in activities of daily living (noting specifically that she had experienced

---

[1] Dr. Fuess's name is alternately spelled Dr. Fuess, Dr. Fuse, and Dr. Fuchs in the Record. It is clear from context that this is the same person, and the court refers to him throughout this Ruling as Dr. Fuess based on his resume. See R. at 2916–18 (resume of Billings S. Fuess).

homelessness), marked difficulties in social functioning (including engaging in destructive relationships and committing crimes resulting in incarceration), and marked difficulties in concentration, persistence, or pace. Id. at 14. ALJ Thomas further concluded that, "[i]f the claimant stopped the substance use, the remaining limitations would not meet or medically equal the criteria of listings 12.04 or 12.06. Id. He found, specifically, that if she stopped abusing substances Edwards would have only mild restrictions in activities of daily living; moderate difficulties with social functioning; moderate difficulties with concentration, persistence, or pace; and no episodes of decompensation. Id. ALJ Thomas concluded that "the claimant would not be disabled if she stopped the substance use" and therefore "the claimant has not been disabled within the meaning of the Social Security Act at any time from the alleged onset date through the date of this decision." Id. at 26.

Edwards appealed Thomas's 2009 Decision, and the Appeals Council denied review, rendering ALJ Thomas's 2009 Decision a final order appealable to the District Court. Id. at 1–4. On appeal, Judge Mark Kravitz of the District of Connecticut concluded that ALJ Thomas had committed legal error when he took the telephonic testimony of Dr. Fuess without notice to the claimant and over the objection of Attorney Katz.[2] See Edwards v. Astrue, No. 3:10-cv-1017 (MRK), 2011 WL 3490024 (D. Conn. Aug. 10, 2011). He therefore vacated ALJ Thomas's 2009 Decision and remanded the case to the Social Security Administration for proceedings consistent with his Ruling.

_____

[2] Although Edwards raised additional challenges to ALJ Thomas's conclusions in his 2009 Decision, Judge Kravitz declined to reach these arguments. See Edwards, 2011 WL 3490024, at *11 ("As remand is warranted on the basis that the medical expert testified telephonically, there is no need to reach the merits of Ms. Edwards's other claims.").

Id. at *11.

On remand, the case was assigned to ALJ Deirdre Horton. ALJ Horton held an initial hearing in the matter on April 29, 2013, at which Edwards did not appear but counsel for Edwards, Attorney Katz, was present. See R. at 1346–73. During the April 2013 hearing, ALJ Horton took the testimony of medical expert James Claiborn, Ph.D.,[3] by live video conference. See id. at 1348. A supplemental hearing was held on September 4, 2013, at which Edwards was present and testified. Id. at 1315–45. Following these hearings, ALJ Horton issued a Decision on February 19, 2014. Id. at 1267–94. In that Decision, ALJ Horton denied benefits, stating "the claimant is under a disability, but . . . a substance use disorders [sic] is a contributing factor material to the determination of disability" and consequently "the claimant has not been disabled under the Social Security Act any time from the alleged onset date through the date of this decision." Id. at 1271. ALJ Horton further found that "[t]he severity of the claimant's mental impairments, considered singly and in combination, did not meet or medically equal the criteria of listings 12.04, 12.06, 12.08, or 12.09." Id. at 1274. She found that Edwards had marked restrictions in activities of daily living (noting that Edwards had lost her long-term job, experienced homelessness, that her driver's license was suspended and then expired, and that she lost custody of her daughter). Id. She also found that Edwards had moderate difficulties in social functioning (noting her tumultuous relationships and run-ins with the law), moderate difficulties in concentration, pace, or persistence (leading to the loss of her long-term job), and had "one to two" episodes of

_____

[3] Dr. Claiborn's name is variously spelled "Dr. Claiborn," "Dr. Clayborne," and "Dr. Claiborne" throughout the Record. The court refers to him as "Dr. Claiborn" in this Ruling, based on the spelling on his resume. See R. at 1553–57 (resume of Dr. James M. Claiborn, Ph.D.).

decompensation (in the form of inpatient hospitalizations).  Id.  Because she found that

Edwards had "marked" limitations in only one category, she disagreed with Dr.

Claiborn's opinion that Edwards met or medically equaled listing 12.09 while she was

abusing substances.  Id. at 1275.[4]

Once again, Edwards appealed the Decision to the District Court.[5]  On November

20, 2014, the Commissioner stipulated to a remand to develop the record further.  That

stipulation provided that the ALJ would develop the record as follows:

> 1. Update the medical evidence of record and attempt to obtain all of the treatment notes from Richard H. Feuer, M.D., and the records from Community Health Center with the help of Plaintiff's representative;
>
> 2. Determine whether Plaintiff is under a disability taking into consideration all of the impairments, including the polysubstance use, following the sequential evaluation process outlined in 20 C.F.R. §§ 404.1520 and 416.920; and, if Plaintiff is found disabled, determine whether the polysubstance use is material to the determination of disability (20 C.F.R. §§ 404.1535 and 416.935 and Social Security Ruling 13-2p);
>
> 3. Further evaluate Plaintiff's subjective complaints pursuant to 20 C.F.R. §§ 404.1529 and 416.929 and Social Security Ruling 96-7p;
>
> 4. Obtain supplemental evidence from a medical expert to assist in determining the nature and severity of Plaintiff's mental impairments, with and without the polysubstance use pursuant to 20 C.F.R. §§ 404.1527(e) and 416.927(e) and Social Security Ruling 96-6p;

---

[4] The court notes that there appears to be a contradiction in ALJ Horton's February 2014 Decision, in that she both concludes that Edwards would not have been disabled absent her substance abuse, and that she was not disabled at any time.  This issue was not addressed on the merits by the district court because the appeal resolved by stipulated remand, but the second paragraph of the Stipulation, reproduced in this Ruling, appears to be designed to address this issue.

[5] Presumably this appeal followed a denial of review by the Social Security Appeals Council, but upon review of the Record, the court found no such denial for ALJ Horton's 2014 Decision.

> 5. Further evaluate whether Plaintiff's past jobs meet the requirements of past relevant work (i.e., performed within the past fifteen years at substantial gainful activity level and long enough to learn how to perform the job) and, if so, with the assistance of a vocational expert, determine whether she can perform the physical and mental demands of this work, and;
>
> 6. If the case proceeds to step five, with the assistance of a vocational expert, determine whether Plaintiff could perform other jobs existing in significant numbers in the national economy with the assessed limitations.

Edwards v. Colvin, No. 3:14-CV-776 (JGM) (Doc. No. 19).

On remand, ALJ Horton held additional hearings on December 18, 2015, R. at 2230–71, and August 30, 2016, id. at 2272–324. Edwards, with Attorney Katz, was present at both hearings, the second of which was primarily devoted to taking the testimony of Dr. Fuess—who, as noted above, testified before ALJ Thomas in 2009—and vocational expert Edmond Calandra. At the August 2016 hearing, Attorney Katz objected to Dr. Fuess's testimony on the basis that Dr. Fuess had previously offered testimony in Edwards's case, id. at 2275, and objected to Calandra as unqualified, id. at 2308. ALJ Horton overruled both objections. Id. at 2276, 2309. Following these hearings, ALJ Horton issued the Decision currently pending before this court on October 21, 2016. See id. 2194–229.

In her October 2016 Decision, ALJ Horton concluded that Edwards meets the insured status requirements of the Social Security Act through December 31, 2007. Id. at 2203. She further found that Edwards has not engaged in substantial gainful activity since the alleged onset date of January 1, 2003. Id. She found that Edwards suffers from the following severe impairments: polysubstance abuse; post-traumatic stress disorder ("PTSD"); major depressive disorder; bipolar disorder; cervical and lumbar degenerative disc disease; and asthma. Id. She noted that Edwards had suffered from

carpal tunnel syndrome in the past, but found that it is a non-severe impairment.  Id. at

2203–04.  She further noted that, although Edwards has suffered from intermittent

gastrointestinal issues and varicose veins, the Record contained no evidence that they

have caused more than minimal limitations.  Id. at 2204.  ALJ Horton found that

Edwards's severe physical impairments did not meet the listings and concluded that

Edwards's mental health conditions, including polysubstance abuse, did not meet or

medically equal a listing at any time.  Id.  In so concluding, she noted that Dr. Fuess

testified "that the claimant had mild restrictions in activities of daily living; moderate

restrictions in social functioning; mild limitations in concentration, persistence, and pace,

and no episodes of decompensation."  Id.  Although ALJ Horton acknowledged that title

20, sections 404.1535 and 416.935 of the Code of Federal Regulations requires an ALJ

to determine whether a claimant's drug and alcohol abuse ("DAA") is a contributing

factor material to the determination of disability "when (1) the adjudicator finds that the

claimant is disabled, and (2) there is medical evidence of DAA during the relevant time

period," she concluded that this analysis was unnecessary in light of her finding that

Edwards had not been disabled at any time.  Id. at 2208.

ALJ Horton concluded that Edwards had the residual functional capacity ("RFC")

to perform light work "with frequent climbing of ramps / stairs; balancing; stooping;

kneeling; crouching; crawling; no ladders / ropes / scaffolds; frequent handling and

fingering" and that she was limited to "[s]hort simple tasks and occasional contact with

the general public; can work around others but no collaborative work."  Id. at 2205.

Based on that RFC, ALJ Horton concluded that Edwards could perform occupations

such as Maid, Dictionary of Occupational Titles ("DOT") number 323.687-014; Mail

Clerk, DOT number 209.687-026; and Assembler, DOT number 706.684-022.  Id. at

2212.  ALJ Horton found that there were 800,000 Maid jobs nationally, 100,000 Mail

Clerk jobs nationally, and 900,000 Assembler jobs nationally.  Id.  She therefore

concluded that jobs exist in "significant numbers in the national economy" that Edwards

could have performed prior to November 1, 2012, making a finding of "not disabled"

appropriate.  Id. at 2212–13.

With respect to the time period from November 1, 2012, onward, however, ALJ

Horton noted that a person of advanced age (fifty-five years old) who is limited to light

work is considered disabled, and that the designation of "advanced age" can be applied

"non-mechanically" under certain limited circumstances to as early as six months before

a claimant's fifty-fifth birthday.  Id. at 2211.  Finding that Edwards's psychiatric condition

worsened in the wake of her son's death and constituted an "additional adversity"

justifying a "non-mechanical application of the rules," and, on this basis, found Edwards

disabled as of November 1, 2012.  Id.  Neither Edwards nor the Commissioner

challenged this finding in the pending Motions, and therefore this court has not

reviewed, and is not vacating, that aspect of ALJ Horton's 2016 Decision.

## IV.        STANDARD OF REVIEW

Under title 42, section 405(g) of the United States Code, it is not the district

court's function to determine de novo whether the claimant was disabled.  See Schaal v.

Apfel, 134 F.3d 496, 501 (2d Cir. 1998).  Instead, the court is limited to two lines of

inquiry: whether the ALJ applied the correct legal standard, and whether the record

contains "substantial evidence" to support her decision.  See Rosa v. Callahan, 168

F.3d 72, 77 (2d Cir. 1999).  "Substantial evidence" is "more than a mere scintilla.  It

means such relevant evidence as a reasonable mind might accept as adequate to

support a conclusion." <u>Richardson v. Perales</u>, 402 U.S. 389, 401 (1971) (quoting <u>Consol. Edison Co. v. NLRB</u>, 305 U.S. 197, 229 (1938)).

## V.       ANALYSIS

In her Memorandum of Law in Support of her Motion to Reverse the decision of the Commissioner, Edwards makes four arguments: (1) that ALJ Horton erred in her application of the treating physician rule, Pl.'s Mem. at 11–19; (2) that ALJ Horton failed to develop the record adequately, <u>id.</u> at 19–25; (3) that ALJ Horton's credibility determination was not supported by substantial evidence, <u>id.</u> at 25–27; and (4) that the ALJ's determination that work existed in substantial numbers in the national economy that Edwards could perform prior to November 1, 2012, was not supported by substantial evidence, <u>id.</u> at 27–36.  The court addresses each of these arguments in turn.

### A.       Treating Physician Rule

The Record for this case includes treating source statements from the following practitioners: (1) Dr. Julia Shi, internist, dated March 1, 2005, R. at 1126–30; (2) Dr. Luis Gonzalez, psychiatrist, dated March 29, 2006, <u>id.</u> at 2164–71; (3) Gustavo Nava, Licensed Clinical Social Worker (co-signed by Dr. J.L. Kurt), dated December 14, 2006, <u>id.</u> at 1113–16; (4) Michael J. Kolpinski, M.S., dated October 30, 2007, <u>id.</u> at 976; and (5) Dr. Richard H. Feuer, psychiatrist, dated November 8, 2012, <u>id.</u> at 2190–93.  The Record also contains a report dated July 20, 2006, written by state agency consultant Jesus Lago, MD, which is based on an interview with Edwards.  <u>Id.</u> at 448–49.  In addition, the Record contains written opinions from four state agency consultants, including: (1) a case analysis by Dr. Thomas Hanny, MD, dated May 18, 2006, <u>id.</u> at 447; (2) a psychiatric review technique form by Dr. Warren Leib, Ph.D, dated August 3,

2006, <u>id.</u> at 450–63; (3) a case analysis by Anita Bennett, MD, dated January 4, 2007, <u>id.</u> at 489; and (4) a mental RFC assessment, case analysis, and psychiatric review technique form by Dominic Marino, Ph.D, dated January 9, 2007, <u>id.</u> at 490–508. Finally, as noted in the procedural history, <u>supra</u> Section III, medical expert testimony by non-examining sources was provided in 2009 by Dr. Fuess, in 2013 by Dr. Claiborn, and in 2015 by Dr. Fuess.

The treating source rule requires that a treating source's medical opinion be given controlling weight if it "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record."  20 C.F.R. § 416.927(c)(2).  Even if controlling weight is not given, "some weight may still be attached to that opinion, and the ALJ must still designate and explain the weight that is actually given to the opinion."  <u>Schupp v. Barnhart</u>, No. 3:02-CV-103 (WWE), 2004 WL 1660579, at *9 (D. Conn. Mar. 12, 2004); <u>see also</u> 20 C.F.R. § 416.927(c)(2) ("Generally, we give more weight to medical opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence . . . .").

Edwards argues that ALJ Horton did not comply with the mandates of the treating physician rule in her evaluations of the medical source statements submitted by Dr. Richard Feuer, R. at 2190–93, and Dr. Julia Shi, <u>id.</u> at 1126–32.  Pl.'s Mem. at 14.

1.  Opinion of Dr. Feuer

The Record contains a document entitled "Mental Residual Functional Capacity Statement" authored by Dr. Richard Feuer, psychiatrist, on November 11, 2012.  R. at

2190–93.  Dr. Feuer noted that he had seen Edwards every two to four weeks since April 2008.  Id. at 2190; see also id. at 1200 (first treatment note by Dr. Feuer).  In his medical source statement, Dr. Feuer noted that Edwards suffers from bipolar disorder, opioid dependence, cocaine dependence, PTSD, hepatitis C, asthma, and chronic pain.  Id. at 2190.  In answer to the question, "Have your patient's impairments, symptoms and limitations lasted since 04/01/2005, the date your patient claims she could no longer work?" he checked the box for "most likely."[6]  Id. at 2190.  Dr. Feuer then categorized a series of functions in terms of whether they do not preclude performance of any aspect of a job ("Category I"), preclude performance for five percent of the work day ("Category II"), preclude performance for ten percent of the work day ("Category III"), or preclude performance for fifteen percent or more of the work day ("Category IV").  Across twenty functions he placed none in Category I, twelve in Category II, five in Category III,[7] and the following three in Category IV: (1) Perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; (2) Sustain an ordinary routine without special supervision; and (3) Complete a normal workday and workweek without interruptions from psychologically based symptoms, and perform at a consistent pace without an unreasonable number and length of rest periods.  Id. at 2191–92.  He opined that Edwards could perform a full-time job less than half as

---

[6] The other available options were: Yes, No, Probably, Possibly, and Unknown.  R. at 2190.  It appears from the layout of the options (although it is not obvious) that "Most Likely" falls between "Probably" and "Possibly."  Id.

[7] Dr. Feuer put the following functions in Category III: (1) Understand and remember detailed instructions; (2) Carry out detailed instructions; (3) Maintain attention and concentration for extended periods of time; (4) Get along with coworkers or peers without distracting them or exhibiting behavioral extremes; and (5) Set realistic goals or make plans independently of others.  R. at 2191–92.

efficiently as an average worker.  Id. at 2193.  He listed Edwards's current GAF[8] score as 50, and stated that her highest GAF score that year had been 56.  In closing, Dr. Feuer offered the following opinion: "There has been deterioration in patient's psychiatric condition since her son was murdered in 6 / 2012.  Her impairments, however, have been evident since I began to treat her in 2008."  Id.

ALJ Horton considered Dr. Feuer's medical source statement in her October 2016 Decision.  Id. at 2210.  She declined to give Dr. Feuer's opinion controlling weight, noting that she had "given some weight to this opinion, but it appears that most of it was generated based on the period from June 2012 to November 2012 and is not a clear picture of the four and a half year history."  Id. at 2210.

Edwards argues that "[t]here is nothing in Dr. Feuer's Mental Residual Functional Capacity Statement to suggest that his function-by-function assessment of Ms. Edwards's condition applies only to the June 2012 to November 2012 period despite the ALJ's speculation to the contrary."  Pl.'s Mem. at 16.  The Commissioner, on the other hand, argues that "most of Dr. Feuer's opinion is consistent with and supports the ALJ's RFC finding" and that "to the extent that Dr. Feuer's opinion contains some more restrictive assessments, the ALJ gave good reasons for declining to give greater weight to the opinion."  Def.'s Mem. at 7.  For example, the Commissioner notes that Dr. Feuer's medical source statement listed her current GAF at 50, but her highest in the

---

[8] According to the DSM IV, the Global Assessment of Functioning ("GAF") is a rating of overall psychological functioning on a scale of 0 to 100.  A rating of 41–50 indicates serious symptoms (such as suicidal ideation, several obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (such as having no friends or being unable to keep a job).  A rating of 51–60 means moderate symptoms (such as flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (such as having few friends or conflicts with peers or co-workers).  Diagnostic and Statistical Manual of Mental Disorders 32 (4th ed. 1994).

past year as 56, which is consistent with a decline in the wake of her son's murder.  Id.;

R. at 2191.  The Commissioner also cites to Dr. Feuer's treatment notes, discussed by

ALJ Horton in her October 2016 Decision, which generally reflect that she was pleasant

and her mood was stable.  See Def.'s Mem. at 8; R. at 2207.

Although they are factually accurate, there are two problems with the

Commissioner's assertions.  First, the facts that Edwards generally presented with a

mood that was "fair" or "mid-range" and had a GAF score as high as 56 in 2012 do not

undermine Dr. Feuer's opinions with respect to Edwards's capacity to work efficiently,

follow a schedule, sustain a routine, and work regularly without interruptions caused by

her psychological impairments.  Cf. Quinones on Behalf of Quinones v. Chater, 117

F.3d 29, 35 (2d Cir. 1997) (rejecting ALJ's daily-activities explanation on the ground that

while "these activities suggest that Jennifer is 'sometimes' able to complete simple, age-

appropriate tasks, they do not refute [evidence] that Jennifer has 'constant' difficulty in

completing both simple and complex age-appropriate tasks").  With respect to the mood

notes in particular, those notes are arguably most relevant to social interaction

functions.  In that area, Dr. Feuer's assessments were entirely consistent with his

treatment notes: he placed Edwards in "Category II" (precludes performance for five

percent of an eight-hour work day) for interacting appropriately with the general public,

asking simple questions or requesting assistance, accepting instructions and

responding appropriately to criticism from supervisors, and maintaining socially

appropriate behavior and adhering to basic standards of neatness and cleanliness, and

in "Category III" (precludes performance for ten percent of an eight-hour work day) for

getting along with coworkers or peers without distracting them or exhibiting behavioral

extremes.  R. at 2191.

The second problem with the Commissioner's reliance on Dr. Feuer's treatment notes is that ALJ Horton did not cite Dr. Feuer's treatment notes as the basis for her decision not to give Dr. Feuer controlling weight.  The court recognizes that ALJ Horton clearly reviewed Dr. Feuer's notes and discusses them in her Decision in the same section that she analyzed Dr. Feuer's medical source statement.  See id. at 2207–08.  However, she explains her decision to give Dr. Feuer's opinion "some weight" on the basis that "most of it was generated based on the period from June 2012 to November 2012 and is not a clear picture of the four and a half year history."  Id. at 2210.  She did not discuss Dr. Feuer's opinions with respect to Edwards's limitations and how, if at all, those opinions are contradicted by his treatment notes.

Having considered ALJ Horton's Decision and the arguments raised by Edwards and the Commissioner, the court concludes that Dr. Feuer's medical source statement is simply ambiguous.  It may be that by saying that Edwards's "impairments have been present" since 2008, Dr. Feuer intended to apply his opinions to the past four and a half years.  It may be that by saying that Edwards's psychiatric condition had "deteriorated" since June 2012, Dr. Feuer meant that Edwards was not severely impaired prior to that time.[9]  ALJ Horton's conclusion that Dr. Feuer meant the latter was "sheer speculation." Selian v. Astrue, 708 F.3d 409, 421 (2d Cir. 2013).

Given the ambiguity of Dr. Feuer's opinion, ALJ Horton should have re-contacted Dr. Feuer for clarification.  An ALJ in a social security benefits hearing has an

---

[9] The court notes that it is further speculation on ALJ Horton's part to conclude that, if Edwards's condition "deteriorated" in the wake of her son's murder in June 2012, she was not disabled until November 2012.

16

affirmative obligation to develop the record adequately.  See Rosa, 168 F.3d at 79. Although this obligation is heightened where the plaintiff is pro se, see Echevarria v. Secretary of HHS, 685 F.2d 751, 755 (2d Cir. 1982), the "non-adversarial nature" of social security benefits proceedings dictates that the obligation exists "even when . . . the claimant is represented by counsel."  Pratts v. Chater, 94 F.3d 34, 37 (2d Cir. 1996) ("It is the rule in our circuit that 'the ALJ, unlike a judge in a trial, must himself affirmatively develop the record' . . . .") (quoting Echevarria, 685 F.2d at 755).

The expert opinions of a treating physician are of particular importance to a disability determination.  See Hallet v. Astrue, No. 3:11-cv-1181 (VLB), 2012 WL 4371241, at *6 (D. Conn. Sept. 24, 2012) (concluding that, "[b]ecause the expert opinions of a treating physician as to the existence of a disability are binding on the factfinder, it is not sufficient for the ALJ simply to secure raw data from the treating physician" and remanding for further development of the record); Ayer v. Astrue, No. 2:11-CV-83, 2012 WL 381784, at *3 (D. Vt. Feb. 6, 2012) (remanding to the ALJ "given the ALJ's failure to request medical opinions from any of Ayer's treating providers . . . which resulted in a substantial gap in the record").

The duty to develop the record sometimes demands that ALJs re-contact treating sources for clarification.  See, e.g., Selian, 708 F.3d at 421 (noting that before relying on a "remarkably vague" treating physician's opinion that contradicted claimants testimony, "[a]t a minimum, the ALJ likely should have contacted [the treating physician] and sought clarification of his report."); Cammy v. Colvin, No. 12-CV-5810 (KAM), 2015 WL 6029187, at *16 (E.D.N.Y. Oct. 15, 2015) (remanding because the ALJ failed to seek additional information from the treating physicians to clarify inconsistencies);

Gabrielsen v. Colvin, No. 12-CV-5694 (KMK) (PED), 2015 WL 4597548, at *7 (S.D.N.Y. July 30, 2015) (finding that the ALJ had the obligation to re-contact the treating physician to seek clarifying information given the treating physician's unique position to resolve certain inconsistencies); Ryszetnyk v. Astrue, No. 12-CV-2431 (SLT), 2014 WL 2986700, at *11 (E.D.N.Y. July 1, 2014) (remanding where the ALJ made no attempt to clarify the inconsistency between the treating physician's treatment notes and his source statement); but see Vanterpool v. Colvin, No. 12-CV-8789 (VEC)(SN), 2014 WL 1979925, at *17 (S.D.N.Y. May 15, 2014) (holding that the ALJ was not required to contact the physician for further information or clarification when the record was complete).

Re-contacting treating sources to clarify opinions is governed by title 20, section 404.1520b of the Code of Federal Regulations ("section 404.1520b"). An ALJ is not always required to re-contact a treating physician to clarify inconsistencies or address incompleteness. Rather, section 404.1520b provides that ALJs "may need to" take action to clarify the record "if after considering the evidence we determine we cannot reach a conclusion about whether you are disabled." 20 C.F.R. § 404.1520b(b)(2). Although re-contacting a treating source is listed as the first option for clarifying the record, section 404.1520b explicitly provides that the ALJ may choose not to re-contact the treating source "if we know from experience that the source either cannot or will not provide the necessary evidence." See 20 C.F.R. § 404.1520b(b)(2)(i).[10] However, neither ALJ Horton nor the Commissioner has asserted that Dr. Feuer was unavailable

---

[10] Other methods for completing or clarifying the record that are listed in section 404.1520b include requesting additional evidence, asking the claimant to undergo a consultative examination, or asking the claimant or others for more information. 20 C.F.R. § 404.1520b(ii)–(iv).

for consultation or that requesting clarification would be "futile." See Gabrielsen, 2015 WL 4597548, at *7 ("[T]he ALJ has made no finding, nor has the Commissioner made any argument, about why [the treating physician] could not have resolved at least some of the inconsistencies at issue, the only circumstance in which the regulations explicitly provide that re-contacting the treating physician is inappropriate."). To the contrary, the Record reflects that Dr. Feuer was still Edwards's treating source as recently as December 2015, and the ambiguity at issue—how long he believes Edwards has had the relevant limitations—is clearly a question that he is well suited to answer.

Therefore, while the court recognizes that ALJs are not required to re-contact a treating source simply because they disagree with the treating source's conclusions, re-contacting is required in this case where ALJ Horton's conclusion that Dr. Feuer's opinion applied only to the time period after June 2012 is sheer speculation, and the Record is otherwise inconclusive as to Edwards's functional limitations.

In determining that this case must be remanded for full development of the record, the court is fully cognizant of the painfully long procedural history in this case. The ambiguity of Dr. Feuer's opinion is not, however, an insignificant detail. If it is true that Edwards had "Category IV" limitations in the areas specified by Dr. Feuer, that would alter the vocational analysis such that Edwards would be disabled. ALJ Horton herself clearly understood this from her questioning of Calandra. During Calandra's testimony at the August 2016 hearing, the following occurred:

> ALJ Horton: [I]f she was . . . limited such that she would be off task, whether it's from needing additional breaks or otherwise, 15% of the workday, would she be able to do those jobs?
>
> Calandra: No.

ALJ Horton: Would she be able to do any jobs if she was off task 15% of the workday?

Calandra: No.

ALJ Horton: And rather than be off task, if she was to be absent from work one to two times a month on a regular basis, would she be able to do those jobs?

Calandra: No.

ALJ Horton: Would she be able to do any jobs?

Calandra: No.

R. at 2310. During examination of Calandra by Attorney Katz, the following occurred:

Attorney Katz: Mr. Calandra, if the individual that you have testified in response to Her Honor's hypothetical was unable to maintain attention and concentration for extended periods of time over 10% of the workday, would that preclude employment?

Calandra: Well, if that renders them off task for more than 10% of the workday, there would be no work.

Attorney Katz: All right. And if the individual was unable to perform the activities within a schedule, maintain regular attendance and be punctual within customary tolerances 10% of the time, would that preclude all the jobs you testified to?

Calandra: . . . . So the 10%—I don't want to start doing the calculation of what that is over a—a 40-hour work week times 4 weeks, but if they're late and it exceeds—or if they're absent unplanned more than 8 hour per month, then that would exclude employment.

Attorney Katz: Okay. And if the individual was unable to sustain an ordinary work routine without special supervision 10% of the time, would that preclude the employment?

Calandra: We're talking about an unskilled job that takes— well, at most, 30 days, with typically a week or two, after that learning period for an unskilled occupation, they are expected to carry out their job duties. Any additional out of the ordinary supervision on a—a regular basis to correct or advise or remind would result in termination.

Id. at 2315–16.  These questions and responses reflect the three areas in which Dr. Feuer placed Edwards in "Category IV," as detailed above.  Therefore, in the opinion of the vocational expert (upon whose testimony ALJ Horton relied in concluding that work existed in significant numbers in the national economy that Edwards could perform prior to November 1, 2012), any one of the three limitations described by Dr. Feuer as a "Category IV" would be sufficiently limiting to render Edwards disabled under the meaning of the Social Security Act.

Of course, after clarification ALJ Horton could still apply the treating physician rule and decide that Dr. Feuer's opinion was not entitled to controlling weight if the record supports such a finding.  However, given the ambiguity of his opinion with respect to the time period at issue, the significance of Dr. Feuer's opinion as to Edwards's disability determination, and the importance generally placed on the opinions of treating physicians (particularly where, as here, the physician is a specialist in the relevant field who sees Edwards frequently and has been treating her for years), the court concludes that remand is necessary for further development of the record in the form of re-contacting Dr. Feuer to clarify his treating source opinion.

### 2. Opinion of Dr. Shi

Dr. Shi's medical source statement was signed under date of March 1, 2005. See R. at 1126–32.  She stated that she was treating Edwards for asthma, opioid dependence, depression, and mood disorder, and opined that Edwards would be unable to work for "6 mos. or more."  Id.  Dr. Shi wrote "N/A" next to all the fields relating to exertional limitations such as lifting, carrying, pushing, and pulling.  Id. at 1127.  She answered "yes" to the question, "Does this person have mental health or substance

abuse issues that impact his / her ability to work?," but wrote "deferred [to] evaluation appointment 3/9/05" or "Northside evaluation 3/9/05" next to all the fields inquiring as to specific mental functional capacity limitations. See id. at 1129–30.

In her 2016 Decision, ALJ Horton gave little weight to Dr. Shi's opinion, on the basis that Dr. Shi is an internist who "cannot assess the claimant's mental health status at that time." Id. at 2210. Edwards construes this clause as a statement that because Dr. Shi is an internist she is incapable of evaluating the claimant's mental health status. Pl.'s Mem. at 15 (directing the court to a Recommended Ruling for a case in which "the ALJ rejected a treating physician's opinion on the ground that the physician is not a specialist in orthopaedics"). Although ALJ Horton's use of the present tense "cannot" could be interpreted as making such a statement, the court interprets ALJ Horton's evaluation as reflecting the fact that Dr. Shi herself deferred the mental health evaluation to the "Northside" evaluation scheduled for March 9, 2005, a conclusion buttressed by the fact that ALJ Horton ended the sentence with the phrase "at that time." In other words, the court concludes that the best reading of ALJ Horton's evaluation is that Dr. Shi "could not assess the claimant's mental health status at that time," a description that is wholly supported by Dr. Shi's opinion statement. The court therefore concludes that ALJ Horton's determination with respect to Dr. Shi's opinion statement is supported by substantial evidence.

It is troubling, however, that the "Northside" evaluation referenced in Dr. Shi's medical opinion statement does not appear to be in the Record. Although it is unclear whether the March 9, 2005 evaluation took place, record evidence indicates that Edwards was first diagnosed with bipolar disorder at Northside in 2007. Id. at 1247

(psychiatric intake evaluation from Connecticut Valley Hospital noting "Dx of Bipolar this year – made @ Northside").  During the supplementary hearing held on August 30, 2016, ALJ Horton asked Attorney Katz where the Northside records were, and Attorney Katz responded, "I have not gone through the 2,200 pages in order to find the Northside notes, but they're in there.  I will find the Northside notes for Your Honor."  <u>Id.</u> at 2296–97.  No further mention of Northside is made during the August 2016 hearing, and there are no medical records labeled "Northside" in the Record.  There are indications in the Record that "Northside" may be Hill Health Center, however, and the Record does contain treatment records from Hill Health Center that are contemporaneous with Dr. Shi's medical opinion statement.  <u>Id.</u> at 464–88 (Hill Health Center records dated December 13, 2005, to September 19, 2006).  However, those records do not appear to include a mental status examination or any records dated March 9, 2005.  This may mean that the evaluation that Dr. Shi referred to never occurred, or that the report of the evaluation was not provided when the treatment records were released, or that Hill Health Center is not "Northside."  Because this case is being remanded for further development of the record, on remand the ALJ should seek to obtain a report of the March 9, 2005, if it occurred.

### 3. Opinion of Dr. Gonzalez

The Record contains a treating source opinion entitled "Medical Report" by Dr. Luis R. Gonzalez, a psychiatrist. R. at 2164–71 (repeated at 2182–89). Dr. Gonzalez noted that he was treating Edwards for depression and PTSD in March 2006. Id. at 2164. He recorded her current GAF as 40, and her highest GAF score that year also as 40. Id. He opined that she was unable to work at that time, and she would be for twelve months or more. Id. He noted that, while she was in residential treatment, "her symptoms of anxiety and depression are reported as worse." Id. He wrote "N/A" next to the fields pertaining to physical limitation, but categorized Edwards as "moderately limited" in thirteen of twenty mental functions and as "markedly limited" in one: responding appropriately to changes in the work setting. Id. at 2186–87.

In her October 2016 Decision, ALJ Horton did not mention Dr. Gonzalez's medical source statement. See id. at 2164–71. The October 2016 Decision does note, however, that the Record contains "an incomplete and unsigned medical report for state benefits in 2006" and cites Exhibit 80F, which appears in the Record at 2139–89, the part of the Record where Dr. Gonzalez's opinion appears. Id. at 2210. ALJ Horton gave this report limited weight on the basis that "there is no mention of substance abuse in this record" and "it is well-established that the claimant was actively using substances at this time." Id.

Edwards does not challenge this finding, or ALJ Horton's failure to consider Dr. Gonzalez's treating source opinion, in her pending Motion to Reverse. Edwards did, however, challenge the exact same language as it appeared in ALJ Horton's February 2014 Decision in her Motion to Reverse that Decision. See Plaintiff's Memorandum of

Law (Doc. No. 18) at 18, Edwards v. Colvin, No. 14-cv-776 (JGM).  During the December 2015 hearing, Attorney Katz summarized the issues that were raised on appeal from ALJ Horton's February 2014 Decision and mentioned that he had raised a treating physician rule argument with respect to Dr. Gonzalez's opinion.  R. at 2238.  ALJ Horton's analysis in her February 2014 and August 2016 Decisions with respect to this "incomplete and unsigned medical report" is identical—and identically incorrect.  Compare id. at 2210 (October 2016 Decision) with id. at 1279 (February 2014 Decision).  First, Dr. Gonzalez's report is signed.  Id. at 2171.  Second, it appears to be complete, as it begins with "Section A. General Information" and ends with Dr. Gonzalez's signature.  Id. at 2164, 2171.  Third, it is replete with references to Edwards's substance abuse problems.  See, e.g., id. at 2164 (noting that Edwards has a "history of substance abuse (cocaine / opiate)"); id. ("Now that she [sic] in a residential therapy facility her symptoms of anxiety and depression are reported as worse."); id. at 2168 (listing opiate and cocaine dependence in the section asking for DSM-IV diagnoses); id. at 2170 (listing Edwards's history of outpatient psychiatric treatment facilities, including APT Foundation, Yale Health, and Community Mental Health Clinic).  In short, Dr. Gonzalez's opinion is neither incomplete nor unsigned, and it makes many references to Edwards's substance abuse.  That ALJ Horton concluded to the contrary (in two separate Decisions) is made all the stranger by the fact that Gonzalez's report actually appears twice in Exhibit 80F—at pages 2164–71 and pages 2182–89.

The treating source rule demands that ALJs "will always consider the medical opinions in your case record," and places particular importance on the opinions of treating physicians.  20 C.F.R. § 416.927(b)–(c).  Dr. Gonzalez authored the medical

source opinion in question while he was treating Edwards, and during the time period in dispute.  Therefore, on remand, the ALJ should consider Dr. Gonzalez's opinion evidence along with the other evidence in this case, and make findings in accordance with the treating physician rule.

      B.    <u>Adequate Development of the Record</u>

In her Memorandum, Edwards argues that ALJ Horton did not adequately develop the record because she failed to obtain, or attempt to obtain, a medical opinion from one of Edwards's treating physicians, Dr. Daniel Wilensky.  Pl.'s Mem. at 20.  As noted in the court's analysis with respect to Dr. Feuer's opinion statement, ALJs have an affirmative duty to develop the record.  <u>See</u> <u>supra</u> Section V(A)(1).

The Commissioner argues that the ALJ was not obligated to develop the record further in this case because the medical record is extensive, the plaintiff and her attorney had many opportunities to submit additional records and failed to do so, and plaintiff's counsel represented at the December 18, 2015 hearing that the record was "as complete as can be made humanly possible."  Def.'s Mem. at 11–14 (quoting R. at 2234).

Whether ALJ Horton fulfilled her obligation to develop the record in failing to obtain an opinion from Dr. Wilensky is a close question.  As aforementioned, ALJs have a duty to develop the record even in cases where the claimant is represented by counsel and may not delegate her duty to develop the record to the claimant's attorney. <u>See</u> <u>Pratts</u>, 94 F.3d at 37; <u>see also</u> <u>Newsome v. Astrue</u>, 817 F. Supp. 2d 111, 137 (E.D.N.Y. 2011) ("The fact that the ALJ requested additional information from the Plaintiff's attorney and did not receive that information does not relieve the ALJ of his duty to fully develop the record."); <u>Harris v. Colvin</u>, No. 11-CV-1497, 2013 WL 5278718,

at **7–8 (N.D.N.Y. Sept. 18, 2013) (noting "with frustration" claimant's counsel's failure to provide documents as promised, but nevertheless concluding that "the ALJ's reliance on claimant's counsel to obtain the treating physician records was inadequate"); but see Rivera v. Comm'r of Soc. Sec., 728 F. Supp. 2d 297, 330 (S.D.N.Y. 2010) ("Courts do not necessarily require ALJs to develop the record by obtaining additional evidence themselves, but often permit them to seek it through the claimant or his counsel.").  At the same time, district courts in this Circuit and unpublished orders from the Second Circuit have concluded that ALJs adequately developed the record without personally contacting treatment providers "where the ALJ did more than solely rely on the plaintiff's counsel to satisfy the duty to develop."  Corona v. Berryhill, No. 15-CV-7117 (MKB), 2017 WL 1133341, at *14 (E.D.N.Y. Mar. 24, 2017) (citing Frye ex rel. A.O. v. Astrue, 485 Fed. App'x 484, 488 n.2 (2d Cir. 2012) (summary order); Jordan v. Comm'r of Soc. Sec., 142 Fed. App'x 542, 543 (2d Cir. 2005) (summary order)).

The Second Circuit considered this issue most recently in Guillen v. Berryhill. 697 Fed. App'x 107 (2d Cir. 2017) (summary order).  In Guillen, the Second Circuit noted that Guillen's "medical records obtained by the ALJ do not shed any light on Guillen's residual functional capacity, and the consulting doctors did not personally evaluate Guillen."  Id. at 108–09.  Furthermore, although the Commissioner argued that the ALJ had twice requested an opinion from Guillen's treating physician, the Second Circuit noted that "it is unclear from the record that such a request was even made."  Id. at 110.  The Second Circuit further emphasized Guillen's pro se status, noting that the ALJ's duties are heightened with pro se claimants.  Id. at 108.

In this case, the court agrees with the Commissioner that the record is

voluminous. ALJ Horton had the benefit of nearly one hundred separate medical records at the time of her October 2016 Decision. Furthermore, over multiple remands, the absence of an opinion statement from Dr. Wilensky was never raised by Edwards or anyone else, as Edwards acknowledges in her Memorandum. See Pl.'s Mem. at 20 ("No one—least of all the ALJ—appears to have sought a medical source statement from Dr. Wilensky . . . ."). To the contrary, throughout the December 2015 hearing, Attorney Katz (who has represented Edwards throughout her application process) commented repeatedly on the comprehensiveness of the record, most notably informing ALJ Horton that the record was "as complete as can be made humanly possible." R. at 2234; see also id. at 2238–42 (noting that previously missing evidence is now in the record). That no one seemed to notice that the record did not contain an opinion by Edwards's treating primary care physician for the first nine years that Dr. Wilensky was treating Edwards (or prior to any of the five hearings, three ALJ Decisions, and two appeals to the District of Connecticut that occurred in those nine years) strikes this court as quite odd.

If the absence of a treating source opinion by Dr. Wilensky was the only gap in the Record, it would be a close question whether remand would be warranted on that basis alone. However, because the court has already concluded that remand is necessary to clarify Dr. Feuer's treating source opinion, the court further orders that, on remand, the ALJ contact Dr. Wilensky to obtain a treating source opinion as well, in the hope that this will be the last remand ever required for Edwards's application. Because the court is vacating ALJ Horton's October 2016 Ruling only with respect to her decision about the period from January 1, 2003, to November 1, 2012, the court notes that Dr.

Wilensky should be asked to provide his opinion as to Edwards's functional capacity during that time period, not her current functional capacity.

Furthermore, in the spirit of ensuring that no more remands will be needed in this case, the court recommends that, on remand, care be taken to inspect the Record and inquire of Edwards whether there are additional providers with whom she was treating regularly during this time period and, if so, steps be taken to obtain opinions from those sources as well. In particular, it appears that Edwards was seeing William Colson, Licensed Alcohol and Drug Abuse Counselor, regularly for at least some of the relevant period of time. <u>See</u> R. at 1175–221. Although Colson is not a physician and therefore would not be entitled to controlling weight under the treating physician rule, the court suggests that his opinion may be useful in making a determination on remand.

C. <u>Credibility Determination of Edwards's Testimony</u>

Edwards argues that ALJ Horton "discounted to insignificance" Edwards's testimony regarding the pain she experienced. Pl.'s Mem. at 25. During the December 2015 hearing, Edwards testified that she is "always in serious pain," R. at 2253, and that she had been going to physical therapy for her pain for four or five years, <u>id.</u> at 2266. She testified that she had been referred to a pain clinic during the summer of 2015, and that she was experiencing serious pain in her neck during the hearing itself. <u>Id.</u> at 2265, 2266. She also testified, however, that Suboxone (which she takes to control heroin cravings) helps with the pain, <u>id.</u> at 2251–52, and that between the last hearing with ALJ Thomas and the first hearing with ALJ Horton (from 2009 to 2013) she was "a lot more able even then to get around and do things." <u>Id.</u> at 2258.

ALJ Horton recited Edwards's treatment history with respect to neck and back pain and took that pain into consideration in determining that Edwards was limited to a

range of light work.  Id. at 2208–09.  Furthermore, ALJ Horton found that Edwards was disabled as of November 1, 2012, and Edwards herself indicated that her neck and back pain had worsened recently.  Given Edwards's testimony, the medical record, and the fact that ALJ Horton did factor pain into her RFC determination, the court finds no legal error in ALJ Horton's evaluation of Edwards's testimony with respect to her pain.

That said, given that this case is being remanded for further development of the record, including to obtain a treating source opinion from Edwards's primary care physician, Dr. Wilensky, the court notes that the ALJ may need to revisit this conclusion in light of new information in the Record.

D.     Determination that Jobs Existed in Substantial Numbers in the National Economy

Edwards's final argument is that ALJ Horton's finding that jobs exist in substantial numbers in the national economy that Edwards could have performed between January 1, 2003, and November 1, 2012, was not supported by substantial evidence because the testimony of vocational expert Edmond Calandra as to the number of Mail Clerk jobs in the national economy was "conjured out of whole cloth."  Pl.'s Mem. at 27–35 (quoting Brault v. Comm'r of Soc. Sec., 683 F.3d 443, 450 (2d Cir. 2012)).

During his testimony at the August 2016 hearing, Calandra testified that a person with Edwards's RFC could perform the work of Mail Clerk, Maid, or Assembler.  Although he based this testimony on the job description laid out in the Directory of Occupational Titles ("DOT"), his testimony as to the number of jobs in the national economy in each of these professions was based on the Bureau of Labor Statistics data for the jobs defined in the Standard Occupational Classification.  R. at 2312–13.  During the questioning of Calandra by Attorney Katz, the following occurred:

> Attorney Katz:  Mr. Calandra, the Bureau of Labor Statistics does not report job incidence data according to DOT code, does it?
>
> Calandra:  It does not.
>
> Attorney Katz:  And it reports it according to Standard Occupational Classification?
>
> Calandra:  They—they may list a number of SOC code numbers in with those numbers, yes.
>
> Attorney Katz:  Well, if you go into the BLS website and the opening page, well, there are several opening pages, but once you get to the numbers associated with the job title, for instance, Mail Clerk, if you scrolled into another page or two, they will give you a brief description of what they consider the essential duties of that occupation to be that they are associating the numbers and if that—if that—if those essential duties that they describe them are consistent with the DOT code number or numbers for a Mail Clerk, then I'm comfortable using those numbers because that essentially are—those are essentially the same essential duties that they're associating with a—for instance, a Mail Clerk.
>
> Attorney Katz:  Would those have differing exertional levels or skill levels?
>
> Calandra:  Well, no.  A mail clerk, and there are a number of DOT code numbers that identify as a Mail Clerk, they are all at the light level and they're all unskilled, so I would have no reason to—to question that they are skilled and the numbers are unskilled and light.

Id. at 2312–13.  Despite Calandra's testimony to the contrary, Edwards asserts in her Memorandum that the SOC classification for Mail Clerk includes fourteen separate DOT positions, eight of which could not be performed by a person with Edwards's RFC.  Pl.'s Mem. at 29.  In a footnote, Edwards argues that the same problem exists with respect to the Assembler position.  Id. at 30 n.53 (asserting that there are 1590 DOT-specified occupations in the SOC classification cited by Calandra for assembler, and only 241,910 persons employed in all 1590 occupations despite Calandra's testimony that

900,000 assembler positions existed in the national economy).

In response to this argument, the Commissioner argues that ALJ Horton "reasonably relied on the vocational expert's testimony, as he identified the source he used, and he had experience placing people in the identified jobs." Def.'s Mem. at 17. In support of her position, the Commissioner notes that the Second Circuit has held that a vocation expert is "not required to identify with specificity the figures or sources supporting his conclusion, at least where he identified the sources generally." Id. at 17–18 (quoting McIntyre v. Colvin, 758 F.3d 146, 152–54 (2d Cir. 2014)). Nevertheless, the Second Circuit has also held that "evidence cannot be substantial if it is 'conjured out of whole cloth.'" Brault, 683 F.3d at 450 (quoting Donahue v. Barnhart, 279 F.3d 441, 446 (7th Cir. 2002)). There is no question that Calandra generally identified his source, namely the SOC data. Whether this evidence actually supports a finding that jobs exist in significant numbers is more dubious. It does not require an advanced grasp of logic to understand that "Edwards can perform positions one through six" and "positions one through fourteen exist in substantial numbers in the national economy" do not tell us whether Edwards can do jobs that exist in substantial numbers in the national economy. See, e.g., Voight v. Colvin, 781 F.3d 871, 879 (7th Cir. 2015) ("[M]any [vocational experts] estimate the number of jobs of a type the applicant for benefits can perform by the unacceptably crude method of dividing the number of jobs in some large category (which may be the only available data) by the number of job classifications in the category, even though there is no basis for assuming' that there is the same number of jobs in each category." (internal citations omitted)).

The Commissioner also argues that Maid, Mail Clerk, and Assembler are "readily

recognizable occupations" and therefore "any reduction in the job incidence numbers for these jobs could not plausibly reduce the incidence so substantially that all three would fall below a significant number in the national economy."  Def.'s Mem. at 18.  However, this was not the basis upon which either Calandra or ALJ Horton based their findings: Calandra testified that his numbers were based on the SOC data, R. at 2312–13, and ALJ Horton based her conclusion on Calandra's testimony, id. at 2212.  Thus, the question is whether the SOC data provided substantial evidence for ALJ Horton's conclusion with respect to job numbers.  The court further notes that, although the terms "maid," "mail clerk," and "assembler" are not obscure, the specific job demands with respect to exertional and non-exertional limitations of each position are hardly common knowledge, and the court is therefore skeptical of the Commissioner's proposed "common sense" approach to job numbers.

Finally, the Commissioner argues that Edwards has made no arguments with respect to the job of Maid, and "the ALJ was required to identify only one job existing in significant numbers."  Def.'s Mem. at 17.  ALJ Horton concluded that there were 800,000 Maid jobs in the national economy, and Edwards has not challenged this finding.  The court therefore agrees with the Commissioner that the Maid job is sufficient, on its own, to satisfy the requirement that jobs must exist in significant numbers in the national economy and concludes that ALJ Horton's conclusion with respect to the existence of significant numbers of jobs in the national economy was supported by substantial evidence.

VI.    CONCLUSION

For the foregoing reasons, Edwards's Motion to Reverse the Decision of the Commissioner (Doc. No. 20) is hereby **GRANTED** and the Commissioner's Motion to

Affirm the Decision of the Commissioner (Doc. No. 21) is hereby **DENIED**. The ALJ's October 2016 Decision is vacated with respect to the time period prior to November 1, 2012, and the case is remanded to the Social Security Administration for further proceedings consistent with this Ruling. The Clerk's Office is instructed that, if any party appeals to this court the decision made after this remand, any subsequent social security appeal is to be assigned to the District Judge who issued the Ruling that remanded the case.

**SO ORDERED.**

       Dated at New Haven, Connecticut this 31st day of January, 2018.


/s/ Janet C. Hall
Janet C. Hall
United States District Judge